FILED
2015 Aug-21  AM 09:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **JEROME KYLE RAINES,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **2:14-CV-1575-KOB** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner** | ) | |
| **Social Security Administration,** | ) | |
| | ) | |
| **Defendant** | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

On February 4, 2011, the claimant, Jerome Kyle Raines, filed a Title II application for disability insurance benefits and a Title XVI application for supplemental security income. (R. 10). Each claim alleged disability beginning on February 1, 2009 because of diabetes mellitus. (R.53-54). The Commissioner denied the claim on April 5, 2011 on the basis that the claimant's condition was not severe enough to prevent him from working. (R. 55)

On May 19, 2011, the claimant timely requested a hearing before an ALJ. (R. 58). ALJ Neil Sullivan held a hearing on November 14, 2012. (R. 24). The ALJ denied the claimant's application in a letter dated December 18, 2012, (R. 7), finding that the claimant was not disabled because he could perform light work with some restrictions. (R. 17-18). The claimant filed a request for review by the Appeals Council on January 17, 2013, (R. 5), and the Appeals Council denied the claimant's request for review on June 25, 2014. (R. 1). Having exhausted his

1

administrative remedies, the claimant now properly appeals the ALJ's decision, and this court

has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). The claimant filed this appeal

on August 13, 2014. (Doc. 1). For the reasons stated below, this court AFFIRMS the decision of

the Commissioner.

## II. ISSUES PRESENTED

Because the claimant is not represented by counsel, the court did not require him to

submit a brief. Because he filed no brief, this court construes his issues to include (1) whether the

ALJ properly applied the pain standard, and (2) whether the ALJ properly considered the reasons

for the claimant's noncompliance with medical treatment.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must

affirm the Commissioner's decision if the Commissioner applied the correct legal standards and

if the factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham*

*v. Apfel,* 129 F.3d 1420, 1422 (11th Cir.1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir.

1987).

"No...presumption of validity attaches to the [Commissioner's] legal conclusions,

including determination of the proper standards to be applied in evaluating claims." *Walker*, 826

F.2d at 999. This court does not review the Commissioner's factual determinations *de novo.* The

court will affirm those factual determinations that are supported by substantial evidence.

"Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402

U.S. 389, 401 (1971).

The court must keep in mind that opinions such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors "are not medical opinions...but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months..." 42 U.S.C. § 423(d)(1)(A). To make this determination, the Commissioner employs a five-step, sequential

evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments
> set forth in 20 C.F.R. pt. 404, subpt. P, app. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?

> An affirmative answer to any of the above questions leads either to the next
> question or, on steps three and five, to a finding of disability. A negative answer
> to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R.§§ 404.1520, 416.920.

A Commissioner evaluating a claimant's pain or other subjective complaints must first consider whether the claimant demonstrated an underlying medical condition. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991); *see also Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002); 20 C.F.R. § 404.1529. If the claimant demonstrates an underlying medical condition, the Commissioner must then determine if any objective medical evidence confirms the severity of the alleged pain, or if the underlying medical condition has been objectively confirmed and is so severe that one could reasonably expect it to give rise to the alleged pain. *Id.* Subjective testimony can satisfy the pain standard if the testimony is supported by medical evidence. *Foote v. Chater*, 67 F.3d 1553, 1561 (11th. Cir. 1995).

If discrediting subjective testimony, the ALJ must explicitly discredit the testimony and must articulate sufficient reasons for doing so. *See Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987); *see also* SSR 96-7p, 1996 4. ("The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight

4

the adjudicator gave to the individual's statements and the reasons for the weight...").        The

reasons articulated for discrediting the claimant's testimony may include the claimant's daily

activities. *Harwell*, 735 F.2d at 1293. However, if the ALJ does not articulate reasons, the court

must accept the claimant's testimony as true. *Holt*, 921 F.2d at 1236.

Refusal by a claimant to follow prescribed medical treatment without good cause will

preclude a finding of disability. 20 C.F.R. § 404.1530(b). However, poverty may excuse failure

to follow prescribed medical treatment. *Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir.

2003). If the ALJ relies *solely* on a claimant's noncompliance as grounds to deny disability

benefits, and the record indicates that the claimant could not afford prescribed medical treatment,

the ALJ must make a determination regarding the claimant's ability to afford treatment. *Id.* If the

ALJ does not substantially or solely base his finding of nondisability on the claimant's

noncompliance, he does not commit a reversible error by failing to consider the claimant's

financial situation. *Id.*

## V. FACTS

The claimant was fifty years old at the time of the ALJ's decision, (R. 10, 54), and is a

high-school graduate, who took two college classes while on active duty in the Army. (R. 29-30).

He has prior relevant work experience as a warehouse worker, (R.40-41), and alleges disability

beginning on February 1, 2009 resulting from diabetes mellitus. (R. 10).

### *Physical Impairments*

The claimant has a long history of diabetes and related problems in his medical record

from the Veterans Administration Medical Center from 2004 to 2012. On April 19, 2004, the

claimant went to the emergency room at the VA to check his blood sugar because his feet were

numb and tingling. The emergency room notes indicate that the claimant had not checked his blood sugar in two months. The notes indicate that claimant smelled of alcohol, and that claimant reported drinking 18 beers per day for 20 years. The nurse recommended that he stop drinking alcohol. The claimant returned for a follow-up the next day, and Dr. James Balart gave the claimant medications for his diabetes, educated him about diabetes, and recommended that the claimant follow up with the Outpatient Substance Abuse Clinic (OSAC) at the VA. (R. 746-58).

The claimant continued to regularly visit the VA for general care related to his diabetes through 2012. On June 8, 2004, the claimant met with a dietician to adjust his diet. (R. 725). At a routine visit for his diabetes on February 3, 2005, he admitted to noncompliance with dietary restrictions, drinking multiple sodas at work and failing to have his labs checked as instructed. (R. 687). On March 12, 2005, the claimant complained of neuropathy, and Dr. Andrew Barreto, a neurology resident, noted his diabetes as the cause, but indicated that the claimant's history of heavy alcohol use may also have contributed. The claimant indicated that his problems had improved since he began taking his medicine. (R. 681-84). On May 5, 2005, Dr. Barreto indicated that his neuropathy was "severe, but not activity limiting." (R. 678).

On November 13, 2005, the claimant went to the emergency room at the VA following a syncopal episode, and his blood sugar measured 400. He reported that he drank five beers before briefly losing consciousness and that his family members helped him to the emergency room. (R. 652). The claimant returned for a follow-up on December 15, 2005, and Dr. Barreto indicated that he was in stable condition and that his diabetic neuropathy was not activity limiting. (R. 635).

On June 20, 2006, the claimant reported that he left work because he was vomiting and

6

that he went to the emergency room at the VA to be cleared to return to work. His blood sugar was 341 at work and 377 while in the emergency room. (R. 617). The claimant reported that he had not taken any of his diabetes medicine, and hospital records indicated that he smelled of alcohol. (R. 614).

At a routine doctor's appointment at the VA on August 1, 2008, the claimant reported having more problems with his diabetes after starting a manual labor job. Dr. Jennifer Sohn indicated that his hypoglycemic episodes could be because of his work, eating less often, and possible noncompliance with medication. (R. 517-19). At a routine appointment for his diabetes on August 26, 2008, the claimant's blood sugar measured 568, and he reported that he had not checked his sugar for several days because his home monitor's battery was dead. (R. 509). In a follow-up appointment for his diabetes on September 4, 2008, a nurse commented that the claimant had numerous issues to address, including "compliance with medications." (R. 496).

At a routine visit on April 21, 2009, a nurse at the VA suggested a referral to a weight loss program outside of the VA, but the claimant refused. (R. 470-71). On October 21, 2009, the claimant requested and received a new glucometer; he was unable to attend a class for training on its use because his son was ill, and he refused to view a video on how to operate the monitor. (R. 449).

On December 10, 2009, the claimant went to the emergency room at the VA when a neighbor saw him unconscious in his front yard. The claimant said he had eaten a smaller than usual breakfast, and admitted to typically drinking eight beers per day. He was released later that day. (R. 437-38).

At a follow-up appointment at the VA on December 23, 2009, clinical pharmacist

Tommy Burnett noted that his problems were "most likely [due to] the patient skipping meals as well as not following a diabetic diet." (R. 424). Burnett recommended meeting with a dietician, but the claimant declined. At this time, the claimant admitted to drinking sweet tea and regular soda, as well as not restricting his carbohydrate intake and eating candy. (R. 422). The claimant missed an appointment with Mr. Burnett on January 7, 2010, and he acknowledged only partial compliance with his medication at another pharmacy appointment on February 1. (R. 419-21). The claimant missed scheduled pharmacy appointments on March 1 and 23, 2010. (R. 416).

On September 10, 2010, the claimant saw Dr. Terrence Shaneyfelt at the VA for a routine visit and he noted his "concern for noncompliance." (R. 400). During the same visit, the claimant reported to have had one episode of hypoglycemia in six months, which was because he had not eaten with his medication, and he denied any other hypoglycemic events. (R. 397). Claimant failed to attend a scheduled appointment at the clinic on October 21 and at the pharmacy on October 22, 2010. (R. 394).

At a routine visit on January 7, 2011, the claimant admitted to drinking four beers daily, and Dr. Michael Gates noted that claimant was in the "contemplation phase" of alcohol abstinence. Dr. Gates also noted his "concern for noncompliance" with claimant's diabetes treatment. (R. 383-84).

On January 25, 2011, the Outpatient Substance Abuse Clinic (OSAC) at the VA admitted claimant, although he stated that he did not have an alcohol problem, but was at OSAC "because of another legal matter." Claimant said that he would be unable to attend OSAC sessions because of work obligations. (R. 369-74).

Claimant had cataract extraction surgery because of his diabetic retinopathy on January

8

28, 2011 with no complications. (R. 213-14). At a follow-up appointment one week later, his vision had improved. (R. 360).

On March 22, 2011, Dr. David Aarons performed a consultative medical exam on the claimant at the request of the Social Security Administration. (R. 760). Dr. Aarons recognized that the claimant had lost consciousness three times over the last year, calling his diabetes "poorly controlled, but better than it was." (R. 763). Dr. Aarons also noted neuropathy of the lower extremities bilaterally in his diagnosis.  He noted that the claimant walked into the exam room without assistance, sat comfortably, got on and off the exam table, and was able to remove his shoes and put them back on. (R. 761). Dr. Aarons concluded that the claimant's general findings, motor strength, muscle bulk, and tone were "within normal limits." (R. 763). Nothing in Dr. Aaron's report indicated any functional limitations. (R. 760-63).

On April 5, 2011, Dr. Robert Heilpern evaluated the claimant's medical records at the request of the Social Security Administration and noted that the claimant's diabetes "is not adequately controlled by his medication." However, he also pointed out that the claimant's other conditions "do not have significant limiting effects" and that he "remains somewhat functional and would be expected to perform some work related activities." Additionally, Dr. Heilpern noted that the claimant's statements about his condition were "partially credible" based on his symptoms and activities of daily living. (R. 770).

On May 3, 2011, the claimant underwent surgery for an anal fistula and perineal abscess. (R. 1038). Later that month at a routine doctor's appointment to check up on his diabetes, the claimant's medical record indicates that his diabetes was gradually improving. (R. 1016). A nurse noted that he was not at risk of falling. (R. 1031).

The claimant went to the hospital with a urinary tract infection on July 13, 2011. His record from this stay indicates that he was "noncompliant with medications" for his diabetes. The claimant reported to have stopped drinking alcohol. (R. 783-86). At a follow-up appointment for his diabetes on January 4, 2012, the claimant reported that he was drinking two to three beers per day. (R. 790). His medical report indicates "poor compliance with taking insulin as prescribed" and "poor compliance with lifestyle modifications/practices." (R. 834).

On January 25, 2012, the claimant missed an appointment with the Medication Management Clinic at the VA. He missed another appointment at the VA pharmacy on February 7. (R. 827-28).

*The ALJ Hearing*

After the Commissioner denied the claimant's request for disability benefits, the claimant requested and received a hearing before an ALJ. (R. 24). At the hearing, the claimant testified that he was a high school graduate; that he took two college courses while in the Army; and that he could read and perform basic math. He testified that he did not suffer any service-related injury while in the Army. (R. 29-30).

The claimant testified that he had not worked since February 1, 2009, but that he occasionally did yard work. He said that he briefly collected unemployment benefits, and that he had previously collected Workers' Compensation benefits in 2007 when he had broken his wrist on the job. While being examined by his attorney, the claimant testified that he was terminated from his job in February 2009 because he was too sick to work. According to the claimant, he was experiencing dizziness, tiredness, and he had passed out on one occasion. The claimant emphasized his fatigue, and claimed that it gave him no ability to function. He testified that he

had good days and bad, and that, on bad days, he struggled to go up and down stairs and he spent

most of his time resting. He stated that he had about five bad days per week. (R. 31-35).

       The claimant stated that he experienced painful neuropathy in his legs and feet, and that

he occasionally took medicine for the neuropathy, but he did not like to take the medicine. He

described his pain as a seven on a scale from zero-to-ten. He testified that the pain occasionally

hurt his ability to concentrate, but that he could pay attention for a two-hour long movie. (R. 35-

36).

       When asked about his noncompliance with medication and treatment, the claimant

explained that he was on a "sliding scale" where he would take a varying amount of medication

depending on his blood sugar. The claimant testified that he ran this system by his doctor, but did

not specify which doctor had given him these instructions. He mentioned that he has had several

doctors, and some were better than others. (R. 37-39).

       The claimant testified that he previously worked in a warehouse in shipping and

receiving. He stated that this job kept him on his feet most of the time, and that he frequently had

to lift objects that weighed about 50 pounds. He testified that he was fired from this job because

his employer had one man die on the job and did not want to risk another employee dying. After

his termination, he applied for two or three different jobs, but claimed that he was not hired

because potential employers viewed him as a risk. The claimant testified that he applied to work

at Piggly Wiggly, at an auto shop doing body work, with a contractor doing light remodeling, and

most recently at Lowe's. When questioned by his attorney, the claimant stated that, if an

employer hired him, he would probably have a hard time going to work on some days. (R. 40-

45).

11

The claimant described that on a typical day, he cooks breakfast for his wife, and he occasionally washes dishes, sweeps, and mops the floor. He stated that he had no hobbies besides doing puzzles, and that he rarely left his home. (R. 43-44).

A vocational expert, Ms. Norma Strickland, testified concerning the type and availability of jobs that the claimant was able to perform. Ms. Strickland testified that the claimant's past relevant work included being a warehouse worker, which is classified as medium and unskilled. The ALJ asked Ms. Strickland to assume a hypothetical individual with the claimant's age, education, and work experience, who was limited to a full range of exertionally light work; could not climb ladders, ropes, or scaffolds; could frequently climb ramps or stairs; could frequently stoop, kneel, crouch, crawl, or balance; would be required to change from a standing position to sitting position once per hour; and should avoid the use of hazardous machinery, operational control of moving machinery, and unprotected heights. Ms. Strickland testified that such an individual could not perform any of the claimant's past work, but that such an individual could work at several jobs that exist in significant numbers in Alabama and in the national economy, such as a storage facility rental clerk (2000 jobs in Alabama, 100,000 nationally), a shipping and receiving weigher (400 jobs in Alabama, 27,000 nationally), or a routing clerk (1000 jobs in Alabama, 73,000 nationally). The ALJ further limited the hypothetical individual to one with the above limitations, but was limited to exertionally sedentary activity. Ms. Strickland testified that such an individual could work as a ticket taker (1000 jobs in Alabama, 70,000 nationally), small parts assembler (500 jobs in Alabama, 28,000 nationally), or package sealer (250 jobs in Alabama, 22,000 nationally), all of which are jobs that exist in significant numbers in Alabama and the national economy. (R. 46-49).

*The ALJ's Decision*

On December 18, 2012, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act from February 1, 2009 through the date of the decision. (R. 18). First, the ALJ found that the claimant met the insured status requirements of the Social Security Act through December 31, 2012 and had not engaged in substantial gainful activity since February 1, 2009. (R. 12).

Next, the ALJ found that the claimant had the severe impairments of diabetes mellitus and diabetic neuropathy. He found these impairments to be severe because the evidence indicated that they caused more than minimal work-related functional limitations for at least twelve months. The ALJ found that the claimant's other health problems of hypertension, hyperlipidemia, erectile dysfunction, scrotal abscess, boils, a wrist fracture, and diabetic retinopathy were not severe impairments because the record contained little evidence that they caused more than minimal work-related functional limitations. (R. 12-13).

To illustrate that these other impairments were not severe, the ALJ set forth the claimant's treatment history for diabetic retinopathy and pointed out that none of the claimant's health care providers noted that the claimant had any functional limitation because of his vision. The ALJ noted that doctors provided medication and education to remedy each of these other issues, indicating that they were not severe. (R. 13).

The ALJ then determined that the claimant did not have an impairment or a combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ pointed to the fact that the claimant received conservative treatment for his diabetes as evidence that the claimant did not meet the requirement

13

for listing 9.00. (R. 13).

Next, the ALJ determined that the claimant had the residual functional capacity to perform exertionally light work, with the additional limitations that the claimant cannot climb ladders, ropes, or scaffolds; can only occasionally climb ramps or stairs; can only frequently stoop, kneel, crouch, crawl, or balance; can change from a standing position to a sitting position at least every hour; and should avoid concentrated exposure to the use of hazardous machinery, operational control of moving machinery, and unprotected heights. To come to this conclusion, the ALJ considered both the claimant's allegations of limitation and the available medical evidence, eventually determining that the claimant's allegations were less than entirely credible. (R. 14).

The ALJ noted that the claimant had a history of poorly controlled diabetes and diabetic neuropathy in the legs and feet. However, the ALJ emphasized that the claimant had a history of not taking his medications as prescribed and not maintaining a proper diabetic diet. The ALJ pointed out that, when the claimant was compliant with treatment recommendations, his symptoms severely diminished. The ALJ pointed to several instances when the claimant was at the hospital with problems related to his diabetes, and, at each time, the claimant was noncompliant with his treatment. Before considering medical opinion evidence, the ALJ noted that, throughout the claimant's records from 2009 to 2012, he had no reported physical or cognitive limitations. (R. 14).

Next, the ALJ considered the medical opinion evidence of consultative Drs. David Aarons and  Robert Heilpern. The ALJ stated that he found these opinions to be "generally credible" because "the combination of [the] evidence strongly supports the conclusions reached

14

by Drs. Aarons and Heilpern." The ALJ explained that Dr. Aarons performed a physical and did not include any significant finding of functional limitation, except for the claimant's diabetic neuropathy. Additionally, the ALJ noted that Dr. Heilpern found that the claimant was capable of performing exertionally light work, and that the claimant's cataract surgery in January 2011 had resolved the claimant's visual impairment. (R. 15).

Ultimately, the ALJ determined that the claimant's statements were not credible for four reasons. First, he noted that the claimant's doctors provided generally conservative treatment, which is not indicative of a significant functional limitation. Second, the ALJ noted that the medical opinion evidence of Dr. Aarons and Dr. Heilpern did not corroborate the claimant's complaints of a significant and profound limitation. Third, the ALJ pointed out that the claimant had applied for several jobs during the time that he was supposedly disabled, indicating that he believed he was capable of working. Finally, the ALJ pointed out that the claimant was capable of performing a range of activities of daily living, such as watching television, completing puzzles, and cleaning the house by mopping and sweeping the floor. Because of all these reasons, the ALJ found the claimant's allegations to be less than credible. Considering these allegations alongside the claimant's medical record, the ALJ found that the evidence supported the limitations in the residual functional capacity statement set forth above. (R. 16).

Finally, the ALJ considered the vocational expert's testimony and concluded that, given his residual functional capacity, age, education, and work experience, the claimant was capable of finding a job that exists in significant numbers in the national economy. The ALJ gave the

examples of rental clerk (3000[1] jobs in Alabama, 100,000 jobs nationally), shipping and receiving clerk (400 jobs in Alabama, 27,000 jobs nationally), and routing clerk (1000 jobs in Alabama, 73,000 jobs nationally). Therefore, the ALJ issued a finding of "not disabled." (R. 17-18).

## VI. DISCUSSION

The claimant filed his appeal pro se and did not file a brief. However, the claimant has a duty to prove his own case and provide evidence in support of his disability claim. "[T]he claimant bears the burden of proving that he is disabled, and, consequently, he is responsible for producing evidence in support of his claim." *Ellison*, 355 F.3d at 1276; *see also* 20 C.F.R. § 416.912(c) (stating "You must provide medical evidence showing that your have an impairment(s) and how severe is it during the time you say you are disabled.").

Here, the claimant, stating that he disagrees with the ALJ's decision and that he is unable to obtain work, gives no specific reason to overturn the decision. In place of any specific issue raised by the claimant, the court will consider (1) whether the ALJ properly applied the pain standard, and (2) whether the ALJ properly considered the claimant's noncompliance with medical treatment.

### Issue 1: The ALJ's application of the pain standard

In this case, the ALJ, applying the Eleventh Circuit's pain standard, discounted the claimant's subjective complaints regarding his limitations. This court finds that the ALJ properly applied the pain standard and substantial evidence supports his findings.

---

[1]The Vocational Expert testified that 2000 jobs as a rental clerk exist in Alabama. This discrepancy is immaterial to the conclusion that the job exists in significant numbers.

16

A Commissioner evaluating a claimant's pain or other subjective complaints must first consider whether the claimant demonstrated an underlying medical condition. *Holt*, 921 F.2d at 1223. Then, the Commissioner must determine if any objective medical evidence confirms the severity of the alleged pain. *Id.* Subjective testimony can satisfy the pain standard if the testimony is supported by medical evidence. *Foote*, 67 F.3d at 1561.

If the ALJ discredits subjective testimony, he must explicitly discredit the testimony and articulate sufficient reasons for doing so. *See Hale*, 831 F.2d at 1011. The reasons articulated for discrediting the claimant's testimony may include the claimant's daily activities. *Harwell*, 735 F.2d 1293. However, if the ALJ does not articulate reasons, the court must accept the claimant's testimony as true. *Holt*, 921 F.2d at 1236.

In the present case, the ALJ found that the claimant's impairments "could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (R. 18). Specifically, he gave four reasons for discrediting the claimant's characterization of his physical capabilities: (1) his doctors' conservative treatment and lack of indication of a functional limitation; (2) the medical opinion evidence that did not validate the claimant's complaint of significant and profound limitations; (3) evidence of the claimant applying for jobs; and (4) the claimant's activities of daily living. (R. 16).

The claimant's medical history from 2004 through 2012 supports the ALJ's first reason for discrediting the claimant's subjective testimony. During the claimant's doctor's appointments for his diabetes and diabetic neuropathy, his doctors prescribed the claimant medication and occasionally suggested weight loss or adjusting his diet. At no time did any doctor indicate any

17

functional limitation related to the claimant's diabetes. The ALJ correctly found that these records are inconsistent with the claimant's testimony that he has no ability to function and that he often must spend all day resting in bed.

Second, the medical opinion evidence on which the ALJ relied to discredit the claimant's subjective complaints exists in the reports of Dr. Aarons and Dr. Heilpern. Specifically, the ALJ noted Dr. Aarons' indication that the claimant's general findings were "within normal limits," and his lack of any functional limitation of the claimant in his report. (R. 763). The ALJ relied on Dr. Heilpern's note that the claimant "remains somewhat functional and would be expected to perform some work related activities." (R. 770). Again, the ALJ accurately noted that this medical evidence is not consistent with the claimant's testimony that he is unable to work.

Next, the ALJ discounted the claimant's subjective complaints based on the fact that the claimant indicated that he was applying for jobs throughout the time period that he alleged he was disabled. These jobs included working as a contractor doing light remodeling, working in a body shop, and working as a grocery store stocker. (R. 42). While the claimant said that he was not confident that he would be able to perform these jobs if he were hired, his application indicates that he believed he was capable of performing the duties of several jobs. The ALJ correctly found that the claimant's capacity to work in a body shop or do light remodeling is inconsistent with the disabling limitations that he alleges.

Finally, the ALJ discounted the claimant's subjective complaints based on his activities of daily living. The ALJ mentioned that he performs household chores, watches television, and

18

completes puzzles.[2] In addition to these activities, the claimant admitted to doing yard work. (R. 16, 31). These activities of daily living weigh against the claimant because he alleges that he has significant limitations that prevent him from working, but he is still capable of maintaining his home by sweeping and mopping the floor and doing yard work. The claimant alleges that he has no ability to function and that, on as many as five days a week, he stays in bed nearly all day. (R. 34-35). These subjective complaints are inconsistent with the claimant's activities of daily living, particularly his mopping, sweeping, and doing yard work. The ALJ correctly found that, if the claimant is capable of performing these activities of daily living, he is capable of performing job duties as well.

Ultimately, each of these reasons support the ALJ's finding that the claimant was not credible and provide a sufficient basis for the ALJ to discredit the claimant's testimony regarding the effects of his alleged symptoms. The court finds that the ALJ correctly applied the pain standard, and substantial evidence supports his decision on this issue.

*Issue 2: The ALJ's consideration of claimant's noncompliance with medical treatment*

The ALJ considered the claimant's noncompliance with medical treatment in denying him disability benefits. While the claimant has a history of noncompliance with medical treatment, he filed this action *in forma pauperis*; lives in subsidized housing, and has been unable to pay numerous traffic tickets. For these reasons, the claimant could argue that the ALJ failed to consider his noncompliance in light of his poverty. This court finds that the ALJ properly

---

[2]This court is unsure why the ALJ considered that the claimant's sedentary activities of watching television and completing puzzles reduced the reliability of claimant's testimony that he could not work. At most, watching television demonstrates the ability to keep one's eyes focused. Considering watching television to make the claimant more capable of performing work is unwarranted.

considered the claimant's noncompliance with his medical treatment notwithstanding his financial situation.

Refusal by a claimant to follow prescribed medical treatment without good reason will preclude a finding of disability, although poverty may excuse failure to follow prescribed medical treatment. *Ellison*, 355 F.3d at 1275. If the ALJ does not substantially or solely base his finding of nondisability on the claimant's noncompliance, the ALJ does not commit reversible error by failing to consider the claimant's financial situation. *Id.*

In this case, the ALJ did not solely or substantially base his decision on the claimant's noncompliance. The ALJ considered all of the claimant's medical history, and pointed to several reasons other than claimant's noncompliance for finding his allegations only partially credible. (R. 16). Additionally, he referenced the medical opinion evidence that found that claimant had no significant limitations that would prevent him from working. (R. 15). In light of these alternative reasons for finding that the claimant had no disability, the ALJ clearly did not base his finding solely or substantially based on the claimant's noncompliance.

Poverty could have a bearing on the claimant's ability to abide by prescribed medical treatment, but nothing in the record indicates that such circumstances exist here. When asked about his noncompliance at the hearing, the claimant explained that he was using a "sliding scale" to determine when to administer his insulin, and he claimed that one of his doctors endorsed this approach. (R. 37-39).  However, the claimant's medical records indicate on numerous occasions that the claimant did not comply with his treatment. Most importantly here, the claimant never suggested that he could not afford his treatment. The record does contains evidence that the claimant was living in poverty; he lived in subsidized housing; and did not

drive a car because of unpaid traffic tickets. (R. 28). However, claimant also indicated that he received *all* of his medical treatment through the VA, so the ALJ was aware that the claimant likely had no difficulty affording his treatment. (R. 33).

Ultimately, however, the ALJ determined that the record suggested the claimant's symptoms and limitations were not of such severity for him to be unable to work. That is, his finding was not based solely or substantially on claimant's noncompliance. For this reason, the court finds that the ALJ properly considered the claimant's noncompliance with medical treatment in finding that the claimant has no disability.

## VII. CONCLUSION

For the reasons stated above, this court concludes that substantial evidence supports the Commissioner's decision. Accordingly, this court AFFIRMS the decision of the Commissioner. The court will enter a separate order to that effect simultaneously.

DONE and ORDERED this 21st day of August, 2015.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE

21